J. L. Greene and Hazel McCormick Greene v. Commissioner.
Greene v. Commissioner
Docket Nos. 109158 and 109159.
United States Tax Court
1942 Tax Ct. Memo LEXIS 105; 1 T.C.M. (CCH) 44; T.C.M. (RIA) 42582; October 31, 1942
*105 Leonard M. Levy, Esq., and Claude Collard, C.P.A., 403 Petroleum Bldg., Fort Worth, Tex., for the petitioners. Wilford H. Payne, Esq., for the respondent. OPPER
Memorandum Opinion OPPER, J.: These consolidated proceedings were brought for a redetermination of deficiencies in petitioners' income tax liability determined by the respondent for the years 1938 and 1939 in amounts as follows: 1938
1939
J. L. Greene
$546.05
$177.92
Hazel McCormick Greene
546.05
177.92
The issues remaining for our determination are whether gains derived from the sale of certain oil and gas properties during the years in question resulted in ordinary income or capital gains, and, dependent upon the decision of the foregoing, questions relating to the allowance of deductions for general expenses for the years 1938 and 1939, and a claimed loss for 1939 upon the dissolution and liquidation of the Midland Chemical Company. An adjustment for depreciation for both of the years in question was conceded by petitioners at the hearing. [The Facts] Petitioners are husband and wife who, during the years 1938 and 1939, were domiciled in the State of Texas. They filed separate individual income *106 tax returns with the collector of internal revenue at Dallas, Texas, on the community property basis. Petitioner J. L. Greene was the manager of the community and for convenience will be hereinafter referred to as petitioner. He has resided in Midland, Texas, for approximately thirteen years. When he first moved to Midland he was an oil scout for the Shell Oil Company but due to the depression was laid off in 1931. Since that date he has engaged in the oil business at Midland where he had maintained an office for a greater portion of the time. Petitioner has acted as a broker, buying and selling oil and gas properties for others and receiving compensation for such services. He holds a brokerage license from the State of Texas. In operations of this sort the purchasers, usually oil companies, provide necessary funds, and the purchases are made by petitioner on behalf of the companies. Petitioner received as commissions for such services the sums of $12,387.06 and $5,185.63 for the years 1938 and 1939, respectively. In 1938 nine separate transactions gave rise to the commission income and in 1939 eight separate transactions were involved. Petitioner's return for the years in question *107 discloses income from producing oil properties in the amounts of $354.59 for 1938 and $51.28 for 1939; dividends of $300 for each of those years; and interest of $10.00 for 1938. Aside from his activities as a broker petitioner acquired and dealt with oil properties of his own. From 1933 and thereafter petitioner purchased for himself a number of leases and mineral interests and at the time of the trial he owned at least 100 such properties. Petitioner was desirous of accumulating some producing properties. He has had some wells drilled over a period of years and is definitely in the oil business. He has not acquired and does not have any properties he would not sell at any time if he thought he could get what they were worth. Petitioner is widely known among oil men, landowners, and individuals in the general area of Midland, Texas. He spends most of his time at his office in Midland unless he is out for the purpose of acquiring oil and gas properties. People know that petitioner has an office where he transacts business. In the sale of the properties in question some of the parties came to him and he went to others. It was done both ways. Petitioner did not utilize any particular *108 method of publicizing the fact that he had oil and gas properties for sale. None of the property sold in 1938 and 1939 had been drilled or developed by petitioner. He was not financially able to develop some of the leases he owned and because of the nature of many of them, he did not want to do so. Petitioner has drilled eleven wells. He has abandoned some properties because they became worthless. In 1938 petitioner sold eighteen oil and gas leases and interest (including one fee property) at a gross profit of $22,057.20. These eighteen properties had been acquired as follows: One in each of the years 1933 and 1934; five in 1935; three in each of the years 1936 and 1937; and five in the year 1938. In the year 1939 petitioner sold nineteen gas and oil leases and interests (including one fee property) at a profit of $15,152.41. These nineteen properties had been acquired as follows: One in 1934, two in 1935; four in 1936; three in 1937; four in 1938, and five in 1939. They and the properties which were sold in 1938 were non-producing. When the properties were acquired petitioner did not know whether they would be held for investment or speculation, drilled, "farmed out" for others *109 to drill, traded or otherwise disposed of, forfeited or abandoned. Petitioner pursued the policy of buying "wildcat" properties, drilling some of them, watching drilling and developing activities in their vicinity, holding certain properties, selling others when his best judgment so dictated, and abandoning properties when they became worthless. The activities of petitioner involving the acquisition and sales of oil and gas properties constituted a trade or business in the years in question. Petitioner incurred and paid ordinary and necessary business expenses in connection with his trade or business of $2,701.47 for 1938 and $1,968.68 for 1939. In the year 1938 petitioner and an associate organized a corporation known as Midland Chemical Company, of which petitioner became president. The corporation had capital stock of $2,000, one-half of which was owned by petitioner. He thereafter advanced the corporation the sum of $ 250. In 1939 the corporation was losing money, so it was dissolved. When its affairs were liquidated in 1939 petitioner lacked $1,014.90 of getting back the sum of his investment and advance to the corporation. [Opinion] In asserting that the oil properties *110 sold by them in the taxable years were capital assets within the statutory definition [1] petitioners dispute only that these assets were "held primarily for sale to customers." On reply brief it is conceded "that the facts and circumstances clearly show and the respondent has ably demonstrated that these petitioners were engaged in a trade or business." It is contended, however, that the properties in question were purchased for investment and, therefore, that they were not held for sale. The statute speaks of sale to customers *111 but it does not require that that be the exclusive purpose. It is sufficient if the assets in question are held "primarily" for that object. Here the facts show that of about 100 oil properties owned by petitioners at the time of the hearing only 11 had been developed in all the years since 1933. Nearly twice as many had been disposed of in each of the two tax years in issue, 18 in 1938 and 19 in 1939. We do not know that similar proportions did not apply in earlier years. Since the investment virtues of these assets would be cofined to those which had been developed to the point of production there was thus in any single instance a great preponderance of probability in favor of a disposition by sale over retention for investment purposes. While not a completely satisfactory test, the ascertainment of purpose, especially primary purpose, is necessarily difficult, and we think that these facts combined with the force of respondent's determination are sufficient to warrant the finding that the oil properties were held primarily, that is principally or chiefly, [2] for sale. *112 Nor is it fatal that those to whom sales were made were not regular or recurrent patrons. The subject matter of the sales was not conducive to repetition. "Where, as here, one is regularly engaged in the business of buying and selling real estate, as was petitioner, any person who can be found to buy such property is a customer, as that term is ordinarily understood, and where such property is held for sale under such circumstances it must be deemed to be held for sale to customers within the meaning of the statute." Charles H. Black, Sr., 45 B.T.A. 204, 210. And see Harold T. Avery, 47 B.T.A. 538. Petitioner maintained an office, was well known in the business, and "sometimes petitioner Greene approached interested buyers, and sometimes buyers approached Greene. It was done both ways; but most of the time buyers and prospective buyers approached Greene," as petitioners phrase it in their brief. Unlike a speculator in securities who buys and sells on an exchange, cf. O. L. Burnett, 40 B.T.A. 605, affirmed this issue (C.C.A., 5th Cir.), 118 F.2d 659, petitioner *113 had personal contacts with purchasers and might be said to have held himself out as a dealer. Under all the circumstances we conclude that the properties sold were not capital assets and that the gain derived was ordinary income. It happens that this also disposes of the other two issues. For respondent's disallowance of certain business expenses is in the alternative only, and falls upon the determination that petitioners were in the business of disposing of the properties. And petitioners concede that the contested loss which they claim "was a 'short term' loss." The item was disallowed solely on the ground that there were no gains against which it could be offset, and the removal from consideration of any capital assets eliminates the possibility of deducting this loss from the profits on their sale. Decision will be entered under Rule 50. Footnotes
1. "SEC. 117. CAPITAL GAINS AND LOSSES (a) DEFINITIONS. - As used in this title - (1) CAPITAL ASSETS. - The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, or property, used in the trade or business, of a character which is subject to the allowance for depreciation provided in section 23 (1)."↩
2. "Primary * * * first in dignity or importance; chief; principal; as * * * a matter of primary importance." Webster's New International Dictionary, Second Edition.↩